STATE OF MINNESOTA *ex rel.* Charles J. Martin and others, Executors, *vs.* ANDREW UELAND, Judge of Probate, and another.

March 8, 1883.

**Probate Court—Jurisdiction to Construe Will—Election by Insane Widow.**—The jurisdiction of the probate court includes the power to construe a will, whenever such construction is involved in the settlement .or distribution of the estate of the testator pending before it. If, under the provisions of a will, there be a case for an election by the widow of the testator whether she will take under the will or against it, and if, by reason of her insanity, she be incompetent to make such election in person, the probate court which appointed a guardian over her estate has the power and right to make such election for her, or to direct her guardian to make it, under the instructions of the court.

Prohibition. The facts stated in the petition and writ were, in substance, as follows:

Cadwallader C. Washburn, of La Crosse, Wisconsin, died May 14, 1882, having made his last will on December 31, 1881, in which he named the relators as his executors. The will was duly proved in Wisconsin, July 5, 1882, and was admitted to probate in Hennepin county, in this state, on August 28, 1882, and the executors named in the will were duly appointed and qualified as executors in this state:

The testator left a widow and two children. The former is and for more than 25 years has been insane, without any lucid intervals, is now an inmate of a private asylum in Massachusetts, and is pronounced by physicians to be incurable. On August 1, 1882, George K. Chase, one of the respondents, was, by the proper court in Wisconsin, and by the probate court of Hennepin county, appointed her guardian, and duly qualified as such.

Among other property the testator died seized of several hundred thousand dollars' worth of real estate in each of the states of Wisconsin and Minnesota, that in the latter state consisting of large flouring-mills, operated by water-power, in the city of Minneapolis, Hennepin county, and rights appertaining thereto. All this real

estate was disposed of by the will. By the laws of Wisconsin, a widow is required to elect, within one year from her husband's death, whether she will take the provision made for her in his will, or claim the provision made for her by the law. The will contained the following provision for the widow: "I direct my executors to bear constantly in mind the wants of my wife, and to set aside, use and expend whatever moneys may be necessary, consistently with her condition, to provide for her comfort and physical health; and I place no limit upon the sums which they may spend upon the purpose indicated." The will contained specific directions for the disposition of the flouring-mills for the benefit of other devisees and legatees.

The guardian of the widow claiming that she was entitled to one-third, in fee, of all her husband's lands in Minnesota in addition to the provision made for her in the will, the executors filed a bill in equity in the circuit court for La Crosse county, Wisconsin, against the widow, her guardian, and all the beneficiaries named in the will, praying for a construction of the will, and asking, among other things, for instruction whether the widow, "being insane, shall take under the provisions of the will or against them?" and whether she "is entitled to one-third of the land of which her husband was seized during coverture in the state of Minnesota, without an election?" and "if the widow must elect, she being insane, by whom or how shall the election be made? If by the court, what shall the election be?"

Pending this suit, the guardian of the widow, on December 11, 1882, filed in the probate court of Hennepin county a paper signed by him in her name and by himself as her guardian, purporting to be an election for the widow to take the provision made by law and a renunciation of the provisions of the will; and on December 15, 1882, the guardian presented to the same court a petition showing that the testator's debts had all been paid, and that his estate, after payment of debts, is of the net value of about $1,700,000; that the real estate in Hennepin county (fully described) is of the value of about $900,000, and praying that an undivided one-third of such real estate be assigned to him, by metes and bounds, or through a sale thereof or otherwise, as the court should decree, and that the executors be re-

quired to deliver to him possession of the real estate so assigned, and account for and pay over to him one-third of the rents, issues and profits thereof since they have had possession; the application also setting forth the election made by the guardian and a demand upon the executors, and praying that the court adjudge the election so made a sufficient election, or that the court make such election for the widow, or authorize her guardian to make it, and that the petition and the disclaimer before filed, be held to be a renunciation of the will and an election to take her legal third of the estate. Upon this petition the probate court cited the executors to appear on January 8, 1883, "to attend the hearing of said petition, and the distribution of one-third of the real estate of said deceased to said Jeannette Washburn."

On January 3, 1883, on application of the executors, a writ of prohibition was allowed and issued from this court, to restrain the respondent Ueland, judge of the probate court, and the respondent Chase, the guardian, from further proceedings on the guardian's petition. In their affidavit (recited in the writ) the relators, in addition to the facts above stated, also set forth other matters showing that the assignment of one-third of the real estate to the widow would defeat the entire scheme of the will in regard to certain charitable foundations, as well as the dispositions made for other beneficiaries, and they charge that the probate court has no power or jurisdiction to make or authorize the guardian to make an election for the widow, or to entertain the guardian's petition.

The writ was made returnable on the first day of the April term, 1883. On February 8, 1883, the respondents filed a motion that the writ be quashed for the following reasons apparent thereon :

1. That this court had no jurisdiction to allow or issue the writ.

2. That the probate court had and always has had full jurisdiction in the matter prohibited and sought to be prohibited.

3. That the petitioners for the writ have a complete and adequate remedy in the probate court and by appeal therefrom.

Thereupon an order was made that the executors show cause on February 20, 1883, why the motion should not be granted.

*McNair, Gilfillan, Biddle & Bailey,* for relators.

*C: K. Davis, W. J. Hahn,* and *Cameron, Losey & Bunn,* for respondents.

MITCHELL, J. Section 5, article 6, of the constitution provides that "the district courts shall have original jurisdiction in all civil cases, both in law and equity, where the amount in controversy exceeds one hundred dollars." Section 7 of the same article provides that "a probate court shall have jurisdiction over the estates of deceased persons and persons under guardianship." In determining the extent of the jurisdiction of these courts, as fixed by this division of judicial power, it is necessary not only to read both sections together, but also to consider and construe them in reference to the system of courts and the division of judicial powers existing in Minnesota at the time the constitution was adopted.

In England—formerly, at least—the settlement of the estates of deceased persons was an important branch of the jurisdiction of courts of equity, a large proportion of the suits in chancery being administration suits. As then administered in that country, the jurisdiction of equity courts included nearly everything pertaining to the settlement of decedents' estates, except the probate of wills and the issue of letters testamentary and letters of administration, and, as incident thereto, the enforcement of the payment of legacies of personal property, of which the ecclesiastical courts had jurisdiction. The court of chancery or the chancellor, as the general delegate of the authority of the king as *parens patriæ,* had exclusive jurisdiction over the persons and estates of infants, lunatics, and all persons under guardianship. All guardians were appointed by that court, and it alone had power to commit the person and property of all such persons to the custody of guardians. Persons under guardianship were the wards of that court. But in most of the American states, courts called probate, surrogate, or orphans' courts were established at an early day for the settlement of the estates of decedents, and the determination of all questions arising in the course of administration, to the practical exclusion of equity jurisdiction over such matters. In many of the states jurisdiction was given to these probate courts over the persons and estates of all persons under guardianship, with power to appoint and remove guardians, and to control the persons and estates of the

wards. Thus an important branch of equity jurisdiction, as formerly administered, was transferred to these courts. In some states, theoretically, courts of equity retained concurrent jurisdiction over these matters, although in practice they would not, in the absence of some distinctive equitable principle, assume to exercise it, but leave the matter to the special probate tribunals. In other states, the jurisdiction thus conferred upon the probate courts was held to be exclusive. The latter was the doctrine which prevailed in this territory and in the states from which it borrowed its probate system; and the provisions of the constitution defining the jurisdiction of the district court and probate court must be understood and construed with reference to this state of things then existing. To hold that the equity jurisdiction given by the constitution to the district court extends to everything which pertained to equity jurisdiction as formerly administered in England, would be utterly inconsistent with the grant of jurisdiction to the probate court. Such a construction would limit the judicial power of the latter court over the estates of deceased persons to the mere probate of wills and the issuing of letters testamentary and of administration, and would deprive it entirely of all jurisdiction over the persons or estates of persons under guardianship.

It was clearly the intention of the constitution to give the probate courts the entire and exclusive jurisdiction over the estates of deceased persons and persons under guardianship, in the same manner and to the same extent that it gives to the district court jurisdiction over civil cases in law and equity arising out of other matters of contract or tort. It also seems clear to us that the grant of jurisdiction to the district court in all cases in law and equity must be understood as having reference to equity jurisdiction and equity jurisprudence as then existing and administered, and not to a system which formerly obtained in England, but which had never prevailed in this state. Of course, many suits may arise out of pending administrations and existing guardianships, of which the district courts, and not the probate courts, would have jurisdiction. Suits by an administrator or a guardian against a stranger, to recover the assets of the decedent or the property of the ward, would be cases of this class. Neither do we mean to decide that there may not be cases

where the district court would have concurrent jurisdiction with the probate court, where they involve some additional equitable feature, such as trust or fraud or the like, which of itself, independent of the administration or guardianship, would be sufficient ground for the interference of a court of equity. But no such case is here involved. Hence it is neither necessary nor advisable to define or enumerate these cases, if there be such.

The jurisdiction of the probate courts over the estates of deceased persons includes the power in the first instance to construe a will, whenever such construction is.involved in the settlement and distribution of the estate of the testator. Its jurisdiction over the estates of persons under guardianship includes not only the appointment of guardians and the control over their official actions, but the care and protection of the estates of the wards, formerly vested in the court of chancery. Hence, in the proceedings now pending in the probate court, that court has the power to construe the will of the decedent, in order to determine whether, under its provisions, it is a case for an election on the part of the widow. And, if it be decided that it is such a case, that court has the right to make the election for the widow, or instruct her guardian to make·it under the directions of the court, she being incompetent to make it in person by reason of insanity. Under the former system in England, jurisdiction over this matter of election belonged to the court of chancery, because that court had the care of the persons and estates of persons *non compotes mentis*, the underlying principle being that the right was to be exercised by the court which had jurisdiction over the person and estate of the insane person. This jurisdiction being now vested in our probate court, this right of election is vested in it.

The case of *Kennedy* v. *Johnston*, 65 Pa. St. 451, to which we are referred, does not at all conflict with these views. The orphans' court of Pennsylvania is a purely statutory court, clothed with very limited powers. The constitution of that state expressly vests in the supreme court and the courts of common pleas "the power of a court of chancery, so far as relates to the care of the persons and estates of those who are *non compotes mentis*."

It follows, in conclusion, that in assuming to act upon the matter

now pending before it, the probate court is not exceeding its juris-diction, and therefore the motion to quash the writ of prohibition must be granted.

Writ quashed.